IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | Case No. 16–CR-30037-NJR |
| DARRIUS LAMAR PLUMMER, BOBBY MARTEL TAYLOR, and TRE DIOR PENN, | ) | |
| Defendants. | ) | |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Pending before the Court are three Motions to Suppress filed by Defendants, Bobby Martel Taylor (Docs. 50 and 51), Darrius Lamar Plummer (Doc. 92), and Tre Dior Penn (Doc. 93). For the reasons set forth below, the Court grants the motions to suppress.

## Introduction and Procedural Overview

Defendants Bobby Martel Taylor ("Taylor"), Darrius Lamar Plummer ("Plummer"), and Tre Dior Penn ("Penn") are charged with conspiracy to distribute and possess with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1) and 846 (Count 1) and conspiracy to acquire controlled substances by fraud in violation of 21 U.S.C. § 843(a)(3) and 846 (Count 2). More specifically, Defendants are charged with making trips throughout the Midwest to unlawfully obtain prescription medications, such as oxycodone, hydrocodone, alprazolam, and promethazine with codeine. All three Defendants have pleaded not guilty to both counts (Docs. 16, 24, and 72).

On August 9, 2017, Taylor, through his previous attorney Assistant Federal Public Defender Todd Schultz, filed a motion to suppress evidence (Doc. 50). In the motion, Taylor seeks to suppress all evidence obtained and statements subsequently made as a result of the traffic stop on December 16, 2014, arguing that such evidence and statements were obtained in violation of the Fourth Amendment. Plummer and Penn also filed motions to suppress, largely adopting the arguments set forth in Taylor's motion (Docs. 92 and 93). On May 21, 2018, the Court heard witness testimony and oral argument and took the matter under advisement.

### Factual Background

On December 16, 2014, Trooper Ryan Albin, who is now deceased,[1] was patrolling Interstate 55 in central Illinois when he observed a Nissan car in front of him in the left lane (Doc. 51-1, p. 1). According to Albin's police report, the driver's door opened and closed, the speed dramatically slowed to approximately 55 mph in a 70 mph zone, and the emergency hazard lights briefly came on (*Id.*). Albin reported that the Nissan would not travel into the right lane and let Albin pass, so he activated his overhead LED red and blue emergency lights and proceeded to pull the Nissan over (*Id.*). As the Nissan pulled onto the shoulder of the roadway, the rear seat passenger immediately popped up (*Id.*).

Albin's police car was equipped with a dash camera that activated as soon as Albin initiated his emergency lights (Doc. 59, p. 5; Government's Hearing Exhibit 1 "ISP Squad Video").[2] Upon initiation of the emergency lights, the dash camera saved camera

---

[1] Albin died in the line of duty on June 28, 2017.
[2] At the evidentiary hearing, Defendants objected to the admission of the dash camera video (Hr. Ex. 1)

footage back one minute (*Id.*). The audio then had a four to five second delay to the video (*Id.*). Thus, the video footage begins with Albin driving down Interstate 55 in the left hand lane and then approaching the Nissan around the 00:30 mark (Hrg. Ex. 1).

The weather conditions are overcast with drizzling rain so the camera footage is not entirely clear (*Id.*). The Nissan's emergency flashers can possibly be seen from the dash camera video, but only for a split second, if at all (*Id.*). The camera footage does not show the driver's side door open and close (*Id.*). Additionally, the camera footage shows that the Nissan is traveling slower than Albin's police car, but the alleged deceleration of the Nissan is difficult to see in light of the fact that the vantage point is from Albin's car traveling behind the Nissan at a much faster rate of speed (*Id.*). For the first twenty-four seconds, Albin's car passes four cars that are traveling in the right lane, evidencing that Albin is traveling at a much faster rate of speed (Hrg. Ex. 1, 00:00-00:24 ).

As soon as Albin activates his emergency flashers, the Nissan crosses into the right lane and onto the shoulder of the highway (Hrg. Ex. 1, 01:07-01:14). Once both vehicles reach a stop, Albin exits his vehicle and approaches the driver's side of the Nissan (Hrg. Ex. 1, 01:50-01:52). Albin greets the driver and asks him why he opened his door (Hr. Ex. 1, 01:53-2:13). In doing so, Albin leans his head down in order to hear the driver's response (Hr. Ex. 1, 02:01-02:15). Albin's police report indicates that, at this time,

---

footage from 16 minutes onward based on hearsay grounds. The Court **OVERRULES** this objection because the Court may consider hearsay in deciding a motion to suppress evidence. *See United States v. Matlock*, 415 U.S. 164, 172-174 (1974) (concluding that the Federal Rules of Evidence precluding the use of hearsay at criminal trials does not apply to suppression hearings and that a trial judge "should receive the evidence and give it such weight as his judgment and experience counsel"); *see also United States v. Raddatz*, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."); *see also United States v. Bolin*, 514 F.2d 554, 557 (7th Cir. 1975) ("Even if the form was hearsay, it is clear that hearsay evidence is admissible in a hearing on a motion to suppress.").

Albin "smelled a strong odor of raw cannabis emitting from within the interior of the vehicle." (Doc. 51-1, p. 1).

The driver of the Nissan identifies himself to Albin as Tre Dior Penn, and the two additional passengers are later identified as Bobby Martel Taylor (sitting in the front passenger seat) and Darius Lamar Plummer (sitting in the back seat) (Doc. 51-1, p. 1). Albin then asks Penn to accompany him to his squad car in order to complete documentation (*Id*).

While sitting in the squad car, Albin asks Penn several questions. Albin first asks Penn if the Nissan is his, to which Penn states that it's a rental car (Hr. Ex. 1, 3:16). Albin then asks Penn where he is heading, to which Penn replies "St. Louis" and upon further inquiry, "Ferguson." (Hr. Ex. 1, 03:20-03:25). Albin asks why they are heading to Ferguson, and Penn explains that they are going there to see the Michael Brown sights (Hr. Ex. 1, 03:25-03:31). Penn also explains to Albin that his door was about to fly open so he had to slow down to close it because it was hard to close it with the wind (Hr. Ex. 1, 03:37-03:45). Albin tells Penn that he is not going to write him a ticket but that next time the door opens he needs to pull over for safety reasons (Hr. Ex. 1, 04:25-04:35). After sitting in the vehicle together for twelve minutes, Albin asks Penn about smoking or having weed inside the vehicle (Hr. Ex. 1, 15:52-16:36). At this point though, Albin had already requested backup assistance in order to search the Nissan (Hr. Ex. 1, 7:53).

Once the backup officer, Chenoa Chief Travis Cornwall ("Cornwall"), arrives on the scene, the officers begin to search the Nissan (Doc. 51-1, p. 2; Hr. Ex. 1, 17:54-21:29). Cornwall activated his body camera to capture video footage of the search of the Nissan

(Doc. 51-1, p. 2; Government's Hearing Exhibit 2 "Chenoa PO Body Camera" Video).

The police report indicates that, as Albin searches the Nissan, he notices a black screw in the passenger's side door (Doc. 51-1, p. 2). He then finds a portion of a plastic guard shielding the lower part of the dash that has a screw missing (*Id.*). He pops off the plastic panel, and a loaded magazine falls to the floor (*Id.*). At this time, Cornwall places each passenger in handcuffs (*Id.*). The search also ultimately turns up a loaded magazine that contains twelve bullets, one Ruger P95 handgun, one blank prescription pad, one filled out prescription, and two Missouri state identification cards in a natural void between the driver and passenger's floor board (*Id.*). Albin also locates an empty prescription package and a receipt from Walgreens in the glove box (*Id.*). Cornwall locates two Missouri identification cards in the front driver's door crown molding (*Id.*). Albin also locates a green plant-like material inside the door handle in the front seat passenger's door, which he indicates has a strong odor of cannabis emitting from it (*Id.*). Trooper Patrick Sorrells ("Sorrells") later weighs and field tests the material; it tests positive for less than .1 gram of cannabis (*Id.*).

### Applicable Law

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. AMEND. IV. The Fourth Amendment guarantees the right of citizens to be free from unreasonable searches and seizures. *See Bailey v. United States*, 133 S. Ct. 1031,

1035 (2013). Where evidence is obtained in violation of this guarantee, the exclusionary rule generally requires that the evidence be suppressed. *See Brock v. United States*, 573 F.3d 497, 499-500 (7th Cir. 2009). The Fourth Amendment requires that searches and seizures, even those of a very short duration, be founded on objective justification. *United States v. Mendenhall*, 446 U.S. 544, 551 (1980).

**Analysis**

In their motions to suppress, Defendants assert that that the initial traffic stop and subsequent search of the Nissan violated the Fourth Amendment of the United States Constitution. Specifically, Defendants argue that (1) Albin lacked probable cause to conduct the traffic stop; (2) Albin lacked reasonable suspicion for the traffic stop; (3) the search of the vehicle by Albin and Cornwall was not supported by probable cause.

### I. The Traffic Stop

Defendants argue that Albin lacked probable cause for the traffic stop because it was not reasonable for Albin to believe that Penn committed a traffic violation. More specifically, they argue that it was not reasonable for Albin to believe that Penn committed a violation for improper lane usage because the alleged violation resulted from Albin's actions, not Penn's actions.

A traffic stop will not violate the Fourth Amendment if the police have probable cause to believe that a traffic violation has occurred. *United States v. Smith*, 668 F.3d 427, 430 (7th Cir. 2012). Probable cause exists when "the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense[.]" *United States v. Cashman*, 216 F.3d 582, 586 (7th Cir. 2000). "A stop and search can be reasonable even if the defendant did not actually commit an offense as long as the

officer reasonably believed an offense occurred." *United States v. McDonald*, 453 F.3d 958, 960 (7th Cir. 2006); *United States v. Cashman*, 216 F.3d 582, 586 (7th Cir. 2000) (the "propriety of the traffic stop does not depend, in other words, on whether [the defendant] was actually guilty of committing a traffic offense . . . . The pertinent question instead is whether it was reasonable for [the police officer] to *believe* that the [traffic violation had occurred]." (emphasis in original)). "The prosecution bears the burden of proving by a preponderance of the evidence that a warrantless stop is supported by probable cause." *United States v. Garcia-Garcia*, 633 F.3d 608, 612 (7th Cir. 2011).

The police report indicates that Albin stopped the Nissan because it was traveling in the left lane and would not move into the right lane to let Albin pass (Doc. 51-1, p. 1-2). The Illinois Vehicle Code provides that upon "all roadways of sufficient width, a vehicle shall be driven upon the right half of the roadway," subject to enumerated exceptions. 625 ILCS 5/11-701(a). It further provides that, "upon an interstate highway, a vehicle may not be driven in the left lane, except when overtaking and passing another vehicle." 625 ILCS 5/11-701(d). An exception to subsection (d) is "when no other vehicle is directly behind the vehicle in the left lane." 625 ILCS 5/11-701(e)(1).

The dash camera video footage shows Albin driving in the left lane and accelerating past four cars that are driving in the right lane before he approaches the Nissan. By the time Albin is directly behind the Nissan, only a matter of seconds goes by before Albin activates his emergency lights to pull the Nissan over. The police report indicates that "[a]t this time a passenger car to [Albin's] right was about ready to pass us in the right slow lane." (Doc. 51-1, p. 1). Under these circumstances, the Court does not

find that Albin could have reasonably believed that a violation of 625 ILCS 5/11-701 occurred.

There was no violation of 625 ILCS 5/11-701(a) because exception 4 applies, as this particular roadway in question was an interstate roadway "restricted to one way traffic." There was no violation of 625 ILCS 5/11-701(d) because subsection (e)(1) applies: there was "no other vehicle directly behind [the Nissan] in the left lane" *until* Albin approached the Nissan from behind and was directly behind it for a matter of seconds. During those few seconds, Penn was not required to move over into the right lane to permit Albin to pass until first ascertaining that he could safely change lanes. As a car to Albin's right was about to pass both Albin and the Nissan, he could not have safely changed lanes.[3] In light of this, the Court finds that the Government has failed to satisfy its burden of demonstrating that that Albin possessed a reasonable belief that Penn committed a violation of 625 ILCS 5/11-701. *See, e.g., People v. Phillips*, 767 N.E.2d. 842, 846 (Ill. App. Ct. 2002) (Appellate Court of Illinois affirmed trial court's ruling that officer was not justified in stopping the defendant for a traffic violation because the evidence showed that any traffic violation by the defendant was specifically caused by the police officer's actions).

The Government does not argue that Albin reasonably believed that any other violations of the Illinois Vehicle Code were committed.[4] Thus, the Court concludes that

---

[3] The dash cam video footage does not show this car that was about to pass, presumably because it slowed down once Albin approached the Nissan and activated his emergency lights.

[4] At the hearing, Special Agent Daniel Rossiter ("Rossiter") testified that slow speed in the left lane is also a traffic violation in Illinois. Albin's police report references the fact that the Nissan was traveling at 55 mph in a 70 mph zone (Doc. 51-1, p. 1). After conducting its own research, the Court believes Rossiter was referring to 625 ILCS 5/11-606, which provides: "Minimum speed regulation. (a) No person shall drive a motor vehicle at such a slow speed as to impede or block the normal and reasonable movement of traffic

Albin lacked probable cause to stop the Nissan.

Defendants also argue that Albin lacked reasonable suspicion to stop the Nissan pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). Police may engage in investigatory stops, known as *Terry* stops, when they have "reasonable suspicion that criminal activity is afoot." *Matz v. Klotka*, 769 F.3d 517, 522 (7th Cir. 2014); *Terry*, 392 U.S. at 30. Reasonable suspicion is "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Jackson*, 300 F.3d 740, 745 (7th Cir. 2002) (citing *Terry*, 392 U.S. at 30)). "A reasonable suspicion requires more than a hunch but less than probable cause and considerably less than preponderance of the evidence." *Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010) (internal quotations omitted). "Ultimately, determining whether reasonable suspicion exists is not an exact science, and must be based on commonsense judgments and inferences about human behavior." *Matz v. Klotka*, 769 F.3d 517, 522 (7th Cir. 2014) (internal quotations omitted). A court must examine the totality of the circumstances in order to determine whether a search or seizure is reasonable under the Fourth Amendment. *See United States v. Cortez*, 449 U.S. 411, 417 (1981); *see also Samson v. California*, 547 U.S. 843, 848 (2006).

The Government asserts that the following observations by Albin constituted reasonable suspicion: "(1) the driver was in the left fast lane beyond passing other vehicles; (2) the driver opened his door while in the left fast lane when the right slow

---

except when reduced speed is necessary for safe operation of his vehicle or in compliance with law." However, because the Government makes no argument in its motion or at oral argument relating to this specific traffic violation, the Court need not consider it. Nonetheless, it does not appear that Albin could have reasonably believed this law was violated based on the Nissan traveling at approximately 55 mph in a 70 mph zone. The police report indicates that Albin issued Penn a written warning for a violation of 625 ILCS 5/11-701 only (Doc. 51-1, p. 2). Albin did not issue a warning based on a violation of 625 ILCS 5/11-606. Had Albin reasonably believed that this law was violated, he would have included it in the warning and his police report.

lane was available to him so he could then pull over on the shoulder; (3) the driver slowed down his car in the left fast lane, but he did not move over; (4) the driver put on his hazard lights on his car in the left fast lane, but he did not move over; and (5) a car (a police car) was directly behind him in the left fast lane, but he did not move over." (Doc. 59, p. 6).

The Court does not find that these things amount to reasonable suspicion that criminal activity was afoot. As the Court previously mentioned, Albin's police report indicates that a passenger to Albin's right was about ready to pass Albin and the Nissan in the right lane. Thus, there is nothing suspicious about the Nissan remaining in the left lane for the amount of time that it did. Also, when Albin came up behind the Nissan and activated his emergency lights, the Nissan *did* move over to the shoulder of the highway. Lastly, it is reasonable for a driver to slow down and turn on emergency hazard lights when attempting to close a door that comes ajar while driving. The Court does not find that this is an objective manifestation of impending criminal activity. Lacking any further indicia of criminal activity, the Court finds that Albin acted on no more than a hunch when he stopped the Nissan.

## II. The Search

Defendants argue that the totality of the circumstances belie Albin's claim that he had probable cause to search the Nissan based on his smelling of raw cannabis.

Under the "automobile exception," the police may conduct a warrantless search of a vehicle when they have probable cause to believe that a "vehicle contains evidence of criminal activity." *United States v. Nicksion*, 628 F.3d 368, 377 (7th Cir. 2010); *see also*

*United States v. Seymour*, 519 F.3d 700, 713 (7th Cir. 2008) ("[A] vehicle may be stopped and searched without a warrant if there is probable cause to believe the vehicle contains contraband or other evidence of illegal activity.'"). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). This includes "passenger's belongings found in the car that are capable of concealing the object of the search." *Wyoming v. Houghton*, 526 U.S. 295, 307 (1999).

"A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (internal quotations omitted). When determining probable cause, a court employs an objective standard considering only the facts that were actually known to the officers at the time of the search." *United States v. Reed*, No. 3:17-cr-00029-RLY-MPB, 2018 WL 306721, at *3 (S.D. Ind. Jan. 5, 2018) (citing *Richardson v. Bonds*, 860 F.2d 1427, 1431 (7th Cir. 1988)). The Government has the burden of demonstrating by a preponderance of the evidence that the automobile exception applies. *See United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009).

The smell of cannabis gives rise to probable cause. *See United States v. Franklin*, 547 F.3d 726, 733 (7th Cir. 2008) ("[a] police officer who smells marijuana coming from a car has probable cause to search that car."). Defendants challenge Albin's credibility, however, so it all comes down to whether the Court believes Albin's statement that he smelled a "strong odor of raw cannabis emitting from within the interior of the vehicle."

(Doc. 51-1, p. 1). As the Seventh Circuit has explained, "the resolution of a motion to suppress" is a "fact-intensive inquiry" in which the district court must make "credibility determinations" based on "its opportunity at the suppression hearing to hear the testimony and observe the demeanor of the witnesses." *United States v. Kempf*, 400 F.3d 501, 503 (7th Cir. 2005). Unfortunately, the Court was unable examine Albin at the evidentiary hearing. Nonetheless, the Court is able to evaluate his credibility by looking at all of the evidence submitted and the testimony of the officers who were able to testify at the evidentiary hearing.

The following things, when considered all together, lead the Court to conclude that Albin was not credible in his assertion that he smelled raw cannabis. When Albin allegedly smelled the "strong odor of raw cannabis emitting from within the interior of the vehicle," he was standing outside the Nissan on a cold December day in windy weather conditions. Further, given that the smell was of *raw* cannabis (not *burnt* cannabis), it is surprising that only a few crumbs[5] were found in the Nissan.[6] It took the

---

[5] At the hearing, Rossiter (who was present for the end of the search) described .1 grams of cannabis as "shake" or a "crumb sized" amount. Sorrells, who performed the testing, indicated that the amount actually weighed *less* than .1 grams. He indicated that, because .1 grams was the lower limit of the weight testing capability, it "could have been much less than that." Sorrells described the amount of cannabis as capable of being held between two fingers or even a set of tweezers.

[6] One of the Government's arguments is that evidence exists that Defendants had large amounts of cannabis *at some point*, which could have had an impact on Albin smelling cannabis. To support this argument, the Government attaches photographs that were allegedly captured from Defendants' cellphones. These photographs depict five images of cannabis located in plastic bags, some of which are located in individual's laps. These photographs, however, lack any detail whatsoever, such as when they were taken. In fact, there is nothing in the photographs indicating that the individuals with the suspected cannabis are Taylor, Plummer, or Penn (and which photo is which Defendant at that) or that the photographs were taken in the Nissan. The Court is further troubled by the Government's argument as it relates to residual odor of raw cannabis constituting probable cause. As more and more states legalize cannabis usage, there is a possibility that individuals could be exposed to frequent searches because their clothes, car (in this case rental car), etc. might carry the residual odor of raw cannabis and provide police with probable cause for a search at any time. This concern is neither here nor there though, because the Government's argument is unsupported in the first place.

officers longer than *fifty-six* minutes[7] to locate these crumbs, which turned up in the conspicuous door handle of the front passenger's side door. At no point during this time did Albin find it necessary to employ his K-9 named "Biko"—who was specially trained to ferret out illegal drugs. Instead, Biko remained in Albin's squad car with Penn (and there is no evidence that he alerted on Penn), while the officers tore the Nissan inside out looking for cannabis.[8] In the police report, Albin stated that the plant-like material he found in the door handle had a strong odor of cannabis emitting from it (Doc. 51-1, p. 2). At the evidentiary hearing, Rossiter indicated that such a tiny amount of cannabis would not emit such a large odor that could be smelled from outside of a car.

The Court also looks to Albin's actions immediately following the smelling of raw cannabis. Specifically, Albin asked Penn to come with him and sit in his squad car so he could hear him better. They engaged in question and answer type conversation for at least twelve minutes before Albin even brought up the cannabis. At this point, Albin had already requested back-up for the search.

While the Court recognizes that Albin received training in order to detect the smell of raw cannabis,[9] the Court does not find his statement that he smelled raw cannabis to be credible. The fact of the weather conditions that day, the way Albin acted following the alleged smelling of raw cannabis, the way Albin went about his search,

---

[7] The Court has arrived at this number based on the video footage: the search of the Nissan begins at 00:21:29 and the video footage cuts off at 01:17:14. After watching the video, the Court did not see the point in time at which the cannabis is located by the officers (and the Government does not point to such point in time on its Table at Doc. 59-1). Thus, the Court presumes that the cannabis was found at some point after the video cuts off.

[8] Rossiter verified at the hearing that, once Albin made the decision to search the Nissan, Rossiter is not aware of any reason why Albin could not have used Biko to aid in the search for cannabis.

[9] This training involved a one-time demonstration where 15-20 grams of raw cannabis were passed around in a bag for officers to sniff.

and the (less than) .1 gram of cannabis "shake" or "crumbs" that ultimately turned up leads the Court to believe that Albin did not actually smell a "strong odor of raw cannabis emitting from within the interior of the vehicle."

The Government argues that Cornwall corroborated Albin's smelling of raw cannabis later during the search. The Court finds this verbal exchange on the video to seem prompted (Hrg. Ex. 2, 02:36-02:40).[10] Additionally, Cornwall placed his head deep into the Nissan when he confirmed the smell of cannabis (*Id.*). When Cornwall was standing outside of the Nissan with the passenger's side front door completely open (the portion of the Nissan that they later discovered contained the cannabis), he indicated that he did not smell it (*Id.*). The Court also struggles to find credible Rossiter's testimony that there was "still a strong odor of raw cannabis in the vehicle three days later" when the crumbs of cannabis were no longer present.

After closely considering the evidence and weighing the credibility of the witness testimony presented, the Court concludes that Albin lacked probable cause to search the Nissan.

**III.    Suppression**

The Court finds that the Government has failed to satisfy its burden of proving that Albin had reasonable suspicion or probable cause to stop the Nissan and has failed to satisfy its burden of proving that Albin had probable cause to search the Nissan. Defendants ask the Court to suppress all evidence seized and statements subsequently made as a result of the traffic stop.

The Supreme Court has directed that "all evidence obtained by an

---

[10] Cornwall did not testify at the evidentiary hearing.

unconstitutional search and seizure [is] inadmissible in a federal court regardless of its source." *Mapp v. Ohio*, 367 U.S. 643, 654 (1951). This exclusionary rule is supplemented by the "fruit of the poisonous tree" doctrine, which bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or seizure. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1962). "If a search or seizure violates the Fourth Amendment, courts will exclude evidence gained from that violation in judicial proceedings against the person injured." *United States v. Rodriguez-Escalera*, 884 F.3d 661 (7th Cir. 2018).

Because the Government has not argued that an exception to the exclusionary rule applies in these circumstances, the Court finds that all evidence and statements obtained as a result of the traffic stop on December 16, 2014 must be suppressed. *United State v. Swift*, 220 F.3d 502, 507 (7th Cir. 2000) ("Evidence which is obtained as a result of an illegal arrest is fruit of the poisonous tree and it must be excluded unless the government can show that it was obtained as a result not of the illegality, but rather 'by means sufficiently distinguishable to be purged of the primary taint."); *see also United States v. Dominguez-Fernand*, No. 1:15-cr-00220-JMS-MJD, 2016 WL 3227340, at *6 (S.D. Ind. June 13, 2016).

**Conclusion**

For the reasons set forth above, the Court finds that Albin did not have probable cause or reasonable suspicion to stop the Nissan and did not have probable cause to search the Nissan on December 16, 2014. Accordingly, the Court **GRANTS** Defendants' Motions to Suppress (Docs. 50, 92, and 93) and **SUPPRESSES** all evidence obtained and

unconstitutional search and seizure [is] inadmissible in a federal court regardless of its source." *Mapp v. Ohio*, 367 U.S. 643, 654 (1951). This exclusionary rule is supplemented by the "fruit of the poisonous tree" doctrine, which bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or seizure. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1962). "If a search or seizure violates the Fourth Amendment, courts will exclude evidence gained from that violation in judicial proceedings against the person injured." *United States v. Rodriguez-Escalera*, 884 F.3d 661 (7th Cir. 2018).

Because the Government has not argued that an exception to the exclusionary rule applies in these circumstances, the Court finds that all evidence and statements obtained as a result of the traffic stop on December 16, 2014 must be suppressed. *United State v. Swift*, 220 F.3d 502, 507 (7th Cir. 2000) ("Evidence which is obtained as a result of an illegal arrest is fruit of the poisonous tree and it must be excluded unless the government can show that it was obtained as a result not of the illegality, but rather 'by means sufficiently distinguishable to be purged of the primary taint."); *see also United States v. Dominguez-Fernand*, No. 1:15-cr-00220-JMS-MJD, 2016 WL 3227340, at *6 (S.D. Ind. June 13, 2016).

**Conclusion**

For the reasons set forth above, the Court finds that Albin did not have probable cause or reasonable suspicion to stop the Nissan and did not have probable cause to search the Nissan on December 16, 2014. Accordingly, the Court **GRANTS** Defendants' Motions to Suppress (Docs. 50, 92, and 93) and **SUPPRESSES** all evidence obtained and

statements subsequently made as a result of the traffic stop on December 16, 2014.

**IT IS SO ORDERED.**

**DATED:   June 1, 2018**

**s/ Nancy J. Rosenstengel_____**
**NANCY J. ROSENSTENGEL**
**United States District Judge**
